

FILED
LODGED
ENTERED
RECEIVED

DEC 30 2008

BY WESTERN DISTRICT OF WASHINGTON
CLERK U.S. DISTRICT COURT
AT SEATTLE
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROSALIE A. MCALLISTER (f.k.a. ROSALIE A. REICHL), | Case No. C07-0700-JPD |
| Plaintiff, | ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| PACIFIC MARITIME ASSOCIATION, et al., | |
| Defendants. | |

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This matter comes before the Court on Defendants' Motions for Summary Judgment. Dkt. Nos. 64, 71. Plaintiff Rosalie McAllister has filed a response opposing the motions, Dkt. No. 80, to which Defendants have replied, Dkt. Nos. 84, 89. After careful consideration of the motions, Plaintiff's opposition and the reply briefs, the governing law, and the balance of the record, Defendants' Motions for Summary Judgment, Dkt. Nos. 64, 71, are GRANTED and all claims against Defendants are DISMISSED.

ORDER
PAGE - 1

## II.   FACTS AND PROCEDURAL HISTORY

### A.   The Prior Actions and the Affirmative Action Plan

Plaintiff has been a longshore worker at the Port of Tacoma since 1988. In May 1996, Plaintiff (along with three other female longshore workers, Nancy Glaser, Linda Nyland, and Kay Thompson) filed a federal lawsuit in Tacoma alleging discriminatory denial of job opportunities and promotions in the longshore industry (the "*Thompson* action"). In June 1997, the *Thompson* action was settled along with a parallel sex discrimination class action (the "*Scott* action") that was brought by female longshore workers Ronalyn Scott and Gail Ross. There was a *Thompson* settlement agreement, Dkt. No. 9, Exh. A, and a settlement agreement that applied to both the *Thompson* action and the *Scott* action (the "*Scott/Thompson* settlement agreement"), Dkt. No. 9, Exh. B.

The *Scott/Thompson* settlement agreement included a female foreman registration and promotion clause that stated at least one out of every five foremen registered in Tacoma (20%) would be female (the "affirmative action plan"). Dkt. No. 9, Exh. B, ¶ 8(A). The *Thompson* settlement agreement also incorporated by reference "all provisions" of the *Scott/Thompson* settlement agreement. Dkt. No. 9, Exh. A, ¶ 2. The *Scott/Thompson* settlement agreement, containing the affirmative action plan (along with the *Thompson* agreement by incorporation), was contingent upon district court approval of a modification of the consent decree in a third federal lawsuit, *Blanchfield v. I.L.W.U.*, whose male plaintiffs had intervened in the *Scott* action and objected to the *Scott/Thompson* settlement agreement's affirmative action plan for female longshore workers.

By Order dated January 8, 1998, the Honorable Franklin D. Burgess approved the modification of the *Blanchfield* consent decree and the *Scott/Thompson* settlement agreement, including its affirmative action plan. Dkt. No. 9, Exh. C. Paragraph 14 of the Order provides that "[t]he Court will retain jurisdiction of this matter for purposes of overseeing implementation of the *Scott* settlement agreement." *Id.* The Court was referring to what has

1  been referred to herein as the *Scott/Thompson* settlement agreement. That Order is the basis
2  for this Court's jurisdiction over the instant action. *See* Dkt. No. 83.

3       B.    The Instant Action

4       Eight years later, in April 2006, Plaintiff filed the instant lawsuit in King County
5  Superior Court, alleging that she was retaliated against because of her participation in the prior
6  *Thompson* and *Scott* actions and was denied promotion to registered foreman because of
7  Defendants' discrimination on the basis of sex in violation of state law. Dkt. No. 9, Exh. D. In
8  May 2007, Plaintiff filed a second amended complaint that added a claim entitled "Breach of
9  Contract," which alleged that Defendants breached her "1997 Settlement Agreement (i.e. the
10  *Thompson* Settlement Agreement) by failing to promote and register McAllister as a foreman
11  from 2002 to 2006." Dkt. No. 9, Exh. F, ¶ 3.11. Defendants removed the case to federal court
12  on the basis of the breach of contract claim because the claim was based on the
13  *Scott/Thompson* settlement agreement and the court-approved affirmative action plan.
14  Plaintiff's two subsequent motions to remand were denied. *See* Dkt. Nos. 11, 83.

15       C.    The Parties' Dispute Regarding the Affirmative Action Plan

16       During the course of the instant action, the parties disputed the terms and meaning of
17  Paragraph 8(A) of the *Scott/Thompson* settlement agreement, which concerns the affirmative
18  action plan's female foreman promotion requirement. Therefore, on August 30, 2007, the
19  Honorable Thomas S. Zilly ordered that the issue of the parties' disputes over the terms and
20  meaning of Paragraph 8(A) be referred to the Honorable J. Kelley Arnold. Dkt. No. 23. The
21  *Scott/Thompson* settlement agreement provided that Judge Arnold, who had presided over the
22  mediation that resulted in the settlement, would decide "[a]ny disputes or disagreements as to
23  the terms or meaning of this agreement, or any of its provisions." *See* Dkt. No. 9, Exh. B, ¶ 17.
24  Judge Zilly also ordered that this case be reassigned to the undersigned judge based on the
25  consent of the parties. Dkt. No. 25.

26

ORDER
PAGE - 3

1       On July 17, 2008, Judge Arnold ruled that *Scott/Thompson* settlement agreement's

2 affirmative action plan began on January 8, 1998 and expired on January 8, 2003, and that

3 among the candidates promoted to registered foremen during that five-year period, 20% (or

4 one out of every five) must be female. Dkt. No. 60. Judge Arnold also found that because 15

5 individuals were promoted to registered foreman from January 8, 1998 to January 8, 2003, but

6 that only two of the 15 individuals were female, Defendants did not comply with the

7 *Scott/Thompson* settlement agreement's affirmative action plan. Dkt. No. 50. Had Defendants

8 promoted one additional female among the 15 individuals promoted to foreman from January

9 8, 1998 to January 8, 2003, Defendants would have complied with the affirmative action plan,

10 because 20% of the individuals promoted to foreman during that period would have been

11 female. *See* Dkt. No. 50.

12       D.    The Process for Promotion to Registered Foreman

13       Plaintiff's complaint centers on her allegation that Defendants failed to promote her to

14 registered foreman because of her sex from 2002 to 2006. The number of registered foreman

15 positions that may be filled each year is determined by negotiations between Defendant Pacific

16 Maritime Association ("PMA"), an employers' association, and the longshore union. Dkt. No.

17 65, ¶ 2. The criteria and procedures utilized for selecting which candidates are to be promoted

18 to registered foreman are determined by a union-management committee under guidance from

19 PMA. *Id.* The foreman eligibility requirements, including a scoring formula for evaluating

20 candidates, are set forth in Foreman Selection Process guidelines. *See* Dkt. No. 65, Exhs. B-C;

21 Dkt. No. 66, Exhs. A-C; Dkt. No. 72, Exhs. D-F. The guidelines look at 11 different factors,

22 specifically: (1) total casual foreman's hours (*i.e.*, work experience of the candidate as a casual

23 foreman); (2) employer complaint history against the candidate; (3) total hours in all longshore

24 occupation codes; (4) hours worked in different longshore occupation codes; (5) total

25 foreman's hours; (6) diversity of casual foreman's hours (a measure of range of experience);

26 (7) skills training completed; (8) total years in the longshore industry; (9) hours of foreman

1   work in comparison to fellow casual foremen; (10) check-in availability (a measure of

2   willingness to be available for and interest in casual foreman's work); and (11) a written exam

3   and an oral exam (two questions each) which, for example, ask questions about safety issues

4   and harassment and discrimination in the workplace. *Id.*

5        To be eligible to apply for a registered foreman position, the candidate must be on the

6   casual foremen's list. Dkt. No. 65, ¶ 3. To be placed on the casual foremen's list, the

7   candidate must have been a Class A registered longshore worker for at least five years. *Id.*,

8   Exh. D. This is a requirement adopted by a union-management committee in 1981. Dkt. No.

9   65, Exh. D. Plaintiff became a Class A registered longshore worker on November 22, 1997.

10  *Id.*, ¶ 14. Therefore, she became eligible to apply for a registered foreman position on

11  November 22, 2002. *Id.*, ¶ 16. Plaintiff applied for casual foreman employment on December

12  13, 2002, and she was added to the casual foreman list on December 18, 2002. *Id.*

13        E.      Foreman Promotions in Tacoma From 2003 to 2006

14        In 2003, 26 casual foremen applied to be a registered foreman, three of whom were

15  female—Nancy Glaser, Karen Walton, and Plaintiff. Dkt. No. 67, Exh. B. The top seven

16  applicants, as scored by the Forman Selection Process guidelines, were promoted to registered

17  foreman, each of whom were male. Dkt. No. 81, Exh. 3; Dkt. No. 67, Exh. B. The three

18  female applicants scored among the bottom four applicants. Dkt. No. 67, Exh. B. Of the seven

19  male applicants who were promoted, each had started as a longshore worker in 1983 or earlier

20  (one started in 1972), and had been a five-year Class A registered longshore worker between

21  6.58 and 12.31 years, or an average of 7.87 years. Dkt. No. 87, Exh. B. Regarding the three

22  female applicants, Glaser started as a longshore worker in 1989, and Walton and Plaintiff

23  started in 1988. *Id.* In addition, 2003 was the first year that each of the female applicants

24  applied to be a registered foreman. Dkt. No. 67, Exh. B; Dkt. No. 87, Exh. B. Moreover, in

25  2003, each of the female applicants had been a five-year Class A registered longshore worker

26  for a year or less. Dkt. No. 87, Exh. B.

ORDER
PAGE - 5

1    In 2004, 24 casual foreman applied to be a registered foreman, three of whom were

2    female—Glaser, Walton, and Plaintiff. Dkt. No. 67, Exh. B. Eight applicants were promoted,

3    seven of whom were male and one (Glaser) who was female. Dkt. No. 81, Exh. 3. The seven

4    male candidates who were promoted scored as the top seven applicants. Dkt. No. 67, Exh. B.

5    Glaser scored tenth, but was nonetheless promoted over the two male candidates who scored

6    eighth and ninth. *Id.* Walton and Plaintiff scored 16th and 19th, respectively. *Id.* Of the

7    seven male applicants who were promoted, each had started as a longshore worker in 1987 or

8    earlier (one started in 1964), and had been a five-year Class A registered longshore worker

9    between 1.46 and 13.74 years, or an average of 7.14 years. Dkt. No. 87, Exh. B. In addition,

10   of the seven males promoted, only one had been a five-year Class A registered longshore

11   worker for less time than Walton and Plaintiff (by about six months). *Id.* However, that

12   individual had worked as a longshoremen two years longer than Walton and Plaintiff. *Id.*

13   In 2005, 16 casual foreman applied to be a registered foreman, two of whom were

14   female—Walton and Plaintiff. Dkt. No. 67, Exh. B. Nine applicants were promoted, including

15   one female (Walton). Dkt. No. 81, Exh. 3. The eight males who were promoted all scored

16   among the top 10 candidates. Dkt. No. 67, Exh. B. Walton scored 11th, and was promoted

17   over two male candidates who scored higher. *Id.* Plaintiff scored 13th among the 16

18   candidates. Of the eight males who were promoted, each had started as a longshoremen in

19   1986 or earlier (one started in 1970), and had been a five-year Class A registered longshore

20   worker between 1.9 and 19.57 years, or an average of 10.56 years. Dkt. No. 87, Exh. B.

21   Moreover, of the eight men promoted, only two (Brad Faker and Boshon Sprague) had been a

22   five-year Class A registered longshore worker for less time than Plaintiff (Sprague by seven

23   months and Faker by one month). *Id.* However, each of them had lengthier tenures as a

24   longshoremen than Plaintiff—Sprague by over two years and Faker by over five years. *Id.* In

25   addition, Faker scored second out of the 16 applicants. Dkt. No. 67, Exh. B.

26

1    In 2006, 16 casual foreman applied to be a registered foreman, two of whom were

2    female—Plaintiff and Heike Meyer. Dkt. No. 67, Exh. B. Seven applicants were promoted,

3    including Plaintiff. Dkt. No. 81, Exh. 3; Dkt. No. 87, Exh. B. The six males who were

4    promoted were the top six scorers (Plaintiff was seventh). Dkt. No. 67, Exh. B. Of the six

5    males who were promoted, each had started as a longshoremen in 1988 or earlier, and had been

6    a five-year Class A registered longshore worker between 1.02 and 9.51 years, or an average of

7    3.83 years. Dkt. No. 87, Exh. B. Meyer, the female applicant who was not promoted, scored

8    right behind Plaintiff. That year was Meyer's first application to be a registered foreman.

9    There have not been any registrations of foremen since 2006 because worked has slowed down

10   and, consequently, no foreman slots are available. Dkt. No. 65, ¶ 7.

11   Taking a broader view of the foreman promotions between 2003 and 2006, out of the

12   28 males promoted to registered foreman during that period, eight males had been a five-year

13   Class A registered longshore worker for a shorter period of time than Plaintiff. Dkt. No. 87,

14   Exh. B. That means that 20 males had been a five-year Class A registered longshore worker

15   for a longer period of time than Plaintiff before being promoted. Excluding 2006, the year

16   Plaintiff was promoted, only four males had shorter tenures as five-year Class A registered

17   longshore workers than Plaintiff.

18   Of the eight males promoted with shorter periods as five-year Class A registered

19   longshore workers than Plaintiff, all began working as longshoremen before Plaintiff, had no

20   employer complaints (Plaintiff had one), and scored among the top-half of the applicants in the

21   years in which they were promoted (four scored in the top five). Dkt. No. 87, Exh. B; Dkt. No.

22   67, Exh. B. In addition, of the three women promoted between 2003 and 2006 (Glaser,

23   Walton, and Plaintiff), Glaser and Walton were each promoted over two male applicants who

24   scored higher than them. No male applicant was ever promoted over a female applicant who

25   scored higher.

26

ORDER
PAGE - 7

1    With respect to promotion rates between 2003 and 2006, females had a 75% promotion

2    rate (3 out of 4 applicants were promoted). Dkt. No. 88, Exh. 2. During that same period, men

3    had a 57% promotion rate (28 out of 49 applicants were promoted). *Id.* On an annual basis,

4    the promotion rate was 0% for women and 30% for men in 2003. *Id.* In 2004, the promotion

5    rate was 33% for women and 33% for men. *Id.* In 2005, the promotion rate was 50% for

6    women and 57% for men. *Id.* In 2006, the promotion rate was 50% for women and 43% for

7    men. *Id.*

8        F.    Foreman Promotions in Tacoma Prior to 2003

9        The affirmative action plan agreed to as part of the *Scott/Thompson* settlement began

10   on January 8, 1998 and expired on January 8, 2003. Dkt. No. 60. In 1998, the first year of the

11   affirmative action plan, 33 casual foremen applied to be a registered foreman, all of whom

12   were male. Dkt. No. 86, Exh. C. Four of the male applicants were promoted. Dkt. No. 81,

13   Exh. 3. In 1999, there was no foreman registration process (*i.e.*, no one applied or was

14   promoted). Dkt. No. 86, ¶ 5.

15       In 2000, the third year of the plan, 24 casual foremen applied to be a registered

16   foreman, three of whom were female—Deborah Johnson, Rosemarie Wiegman and Gail Ross.

17   Dkt. No. 86, Exh. C. Johnson and Wiegman, despite scoring near the bottom in the Foreman

18   Selection Process guidelines, were each promoted to registered foreman. Dkt. No. 81, Exh. 3.

19   This is because, to comply with the affirmative action plan, female applicants were promoted

20   based on how they scored relative to other female applicants, rather than as compared to the

21   male applicants. Dkt. No. 85, ¶ 6. Johnson and Wiegman had each scored ahead of Ross.

22   Dkt. No. 86, Exh. C. However, Ross, while not promoted to a registered foreman, did accept a

23   promotion to clerk registration that was effective June 20, 2001. Dkt. No. 65, ¶ 10. Six male

24   casual foremen were also promoted in 2000, all of whom scored among the top eight

25   applicants. Dkt. No. 86, Exh. C. Therefore, of the three female applicants in 2000, two were

26

promoted to registered foreman (or a 67% promotion rate), and of the 21 male applicants, six were promoted (or a 29% promotion rate). Dkt. No. 86, Exh. C; Dkt. No. 81, Exh. 3.

In 2001, 24 casual foremen applied to be a registered foreman, all of whom were male. Dkt. No. 86, Exh. C. Three of the male candidates were promoted, each of whom scored among the top third of the applicants. Dkt. No. 81, Exh. 3.

In 2002, there was no foreman registration process (*i.e.*, no one applied or was promoted). Dkt. No. 86, ¶ 5. That year was a labor contract renegotiation year in which PMA and the union were involved in contract negotiations for several months, and which ultimately led to a well-publicized lockout at 29 ports along the West Coast before President Bush obtained an emergency injunction to reopen them in October 2002. *Id.* PMA and the union eventually reached a labor agreement later that year. However, PMA and the longshore union did not negotiate additional foreman slots to be filled that year. *Id.*

G.    Individual Defendant Joseph Weber

Joseph Weber has been sued by Plaintiff in his individual capacity. Weber has been the Pacific Northwest Area manager for PMA since April 2000, and was an assistant manager prior to that position. Dkt. No. 72, ¶ 1. In 1995, Weber chaired a subcommittee of the Foreman's Management Committee which was in charge of the initial development of criteria and procedures for selecting registered foremen. *Id.*, ¶ 7. The committee obtained significant input from the employers and the union. *Id.*; Dkt. No. 66, ¶ 4. The selection criteria have been modified somewhat in subsequent years. Dkt. No. 65, ¶ 2. Currently, Weber oversees the PMA staff in its administrative support of the Labor Relations Committee, which selects which applicants to promote. *Id.*, ¶¶ 9-10. Weber does not make any of the foreman promotion decisions, nor does he score applicants for promotions or evaluate applicants' written and oral examinations. *Id.*, ¶¶ 9-11.

1

### III.    JURISDICTION

2       Pursuant to 28 U.S.C. § 636(c), the parties have consented to having this matter heard

3   by the undersigned Magistrate Judge.  The Court has jurisdiction over Plaintiff's breach of

4   contract claim because the district court expressly retained jurisdiction over the

5   implementation of the *Scott/Thompson* settlement agreement's affirmative action plan.  *See*

6   Dkt. No. 9, Exh. C, ¶ 14; *see also Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S.

7   375, 381 (1994).  The Court exercises supplemental jurisdiction over Plaintiff's state law

8   employment claims pursuant to 28 U.S.C. § 1367(a).  Venue is proper under 28 U.S.C.

9   § 1391(b).

### IV.    DISCUSSION

11      A.    Summary Judgment Standard

12      "Claims lacking merit may be dealt with through summary judgment under Rule 56" of

13  the Federal Rules of Civil Procedure. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

14  Summary judgment "shall be entered forthwith if the pleadings, depositions, answers to

15  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

16  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

17  matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if it constitutes evidence

18  with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

19  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material" if it

20  "might effect the outcome of the suit under the governing law." *Id.*

21      When applying these standards, the Court must view the evidence and draw reasonable

22  inferences therefrom in the light most favorable to the nonmoving party. *See United States v.*

23  *Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2006).  The moving party can carry its

24  initial burden by producing evidence that negates an essential element of the nonmoving

25  party's claim, or by establishing that the nonmoving party does not have enough evidence of an

26

essential element to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once this has occurred, the procedural burden shifts to the party opposing summary judgment, who must go beyond the pleadings and affirmatively establish a genuine issue on the merits of the case. Fed. R. Civ. P. 56(e). The nonmovant must do more than simply deny the veracity of everything offered by the moving party or show a mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The mere existence of a scintilla of evidence in support of the plaintiff's position is likewise insufficient to create a genuine factual dispute. *Anderson*, 477 U.S. at 252. To avoid summary judgment, the nonmoving party must, in the words of Rule 56, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party's failure of proof concerning an essential element of its case necessarily "renders all other facts immaterial," creating no genuine issue of fact and thereby entitling the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

B.  Plaintiff's Sex Discrimination Claims

Plaintiff alleges that she was denied promotion to registered foreman on the basis of her sex because of Defendants' disparate treatment discrimination, disparate impact discrimination, and pattern and practice of discrimination, all in violation of the Washington Law Against Discrimination, RCW 48.60, *et seq.* Dkt. No. 9, Exh. F, ¶¶ 3.3, 3.5.

1.  Disparate Treatment

In analyzing state law employment discrimination claims, Washington adopts the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (*citing Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 23 P.3d 440, 446 (Wash. 2001)).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of sex discrimination consisting of the following elements: (1) the plaintiff belongs

ORDER
PAGE - 11

1    to a protected class; (2) she was performing the job satisfactorily; (3) she suffered an adverse

2    employment action; and (4) male employees with qualifications similar to her own were

3    treated more favorably (*i.e.*, she suffered the adverse employment action because of her sex).

4    *See McDonnell Douglas Corp.*, 411 U.S. at 802. If the plaintiff establishes a prima facie case,

5    the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for

6    its adverse employment decision. *Id.* Once the defendant satisfies this burden, the plaintiff

7    must demonstrate that the employer's alleged reason for the adverse employment decision is a

8    pretext for a discriminatory motive. *Id.* at 804.

9         Here, the parties appear to agree that the first three elements of Plaintiff's prima facie

10   case are met. As to the fourth element, Plaintiff alleges she was treated less favorably than

11   similarly qualified male longshore workers because she had greater seniority as a Class A

12   registered longshore worker and more working hours than "some" male workers who were

13   promoted before her. Dkt. No. 80 at 12. However, while it is true that eight males who were

14   promoted between 2003 and 2006 had worked as five-year Class A registered longshore

15   workers for a shorter tenure than Plaintiff, it is equally true that an even greater number of

16   males (20) had longer tenures as five-year Class A registered longshore workers than Plaintiff

17   before being promoted. Dkt. No. 87, Exh. B. Therefore, Plaintiff was treated more favorably

18   than more than double the number of men who were treated more favorably than her. In

19   addition, while Plaintiff was a five-year Class A registered longshore worker for 3.93 years

20   before she was promoted, the 28 males promoted between 2003 and 2006 were five-year Class

21   A registered longshore workers an average of 7.59 years, nearly double the length of Plaintiff's

22   tenure. Dkt. No. 87, ¶ 3, Exh. B. On an annual basis, the average tenure as a five-year Class A

23   registered longshore worker for males promoted to registered foreman was 7.87 years in 2003,

24   7.14 years in 2004, 10.56 years in 2005, and 3.83 years in 2006. Dkt. No. 87, Exh. B.

25   Therefore, Plaintiff's tenure as a five-year Class A registered longshore worker (3.93 years)

26   was significantly shorter than the average male tenure in three out of the four relevant years.

1   Moreover, considering working hours, out of the 28 males promoted in Tacoma between 2003

2   and 2006, only three had less working hours than Plaintiff before being promoted (and two of

3   the three were promoted on the same day as Plaintiff). Dkt. No. 68, Exh. A.[1]  Put another way,

4   Plaintiff had less working hours before being promoted than 25 out of 28 males.

5       Plaintiff also alleges she was treated less favorably because she had to wait longer to be

6   promoted (*i.e.*, she had to apply several times before she was promoted). Dkt. No. 80 at 12.

7   But while Plaintiff was not promoted until her fourth application for promotion, the number of

8   times she applied for a promotion is not, on its own, evidence that she was treated less

9   favorably than male applicants. The number of times one applies is not indicative of that

10  person's seniority, experience, or qualifications, nor is it a reasonable substitute for any of the

11  11 different factors PMA uses to score promotion candidates. Moreover, Plaintiff applied for

12  promotion in her first year of eligibility and each year thereafter. In contrast, 21 of the 28

13  males promoted from 2003 to 2006 did not apply for promotion until at least their third year of

14  eligibility. *See* Dkt. No. 87, Exh. B.  Given that these male applicants had gained more years

15  of experience as a five-year Class A registered longshore worker before first applying for

16  promotion, it is not surprising that for many of them it took less applications than Plaintiff to

17  be promoted. In any case, of the 28 males promoted between 2003 and 2006, eight of them

18  had to wait until their third or fourth application to be promoted. Further, Nancy Glaser

19  applied twice and Karen Walton applied three times before they were promoted, which is

20  comparable to or less than the number of applications for 18 of the 28 male workers who were

21  promoted between 2003 and 2006. *Id.*

22      Plaintiff also asserts that she was treated less favorably because she was required to be

23  evaluated under a promotion system that PMA had previously recognized (in connection with

---

[1]  In addition, only two of the 28 males promoted in Tacoma between 2003 and 2006
had started in the longshore industry after Plaintiff. *See* Dkt. No. 70, Appendix A.  One started
about two months after Plaintiff and the other started less than five months after Plaintiff. *Id.*
The two men were each promoted on the same date as Plaintiff. *Id.*

the implementation of the affirmative action plan) as disfavoring women. Dkt. No. 80 at 12. However, the uncontroverted evidence reveals that after the affirmative action plan expired on January 8, 2003, promotion rates for women substantially improved under the same promotion system that existed prior to the affirmative action plan. During the five-year period of the affirmative action plan, there was only one year (2000) in which there was a foreman registration process and female workers applied to be promoted. That year, three females (Johnson, Wiegman, and Ross) applied and two (Johnson and Wiegman) were promoted, Dkt. No. 81, Exh. 3, which is a 67% promotion rate. In contrast, that year the male promotion rate was only 29%. After the affirmative action plan expired, the promotion rate for females still improved—the promotion rate for women between 2003 and 2006 was 75%. The promotion rate for men over the same period was 57%. While the promotion rate for women was 0% in 2003, the women's promotion rate was comparable to or greater than the men's promotion rate from 2004 to 2006. Moreover, the one female who applied and was not promoted for the period between 2003 and 2006 (Heike Meyer), scored right behind Plaintiff in 2006, who was promoted that year. Dkt. No. 67, Exh. B. Plaintiff also went from scoring second-to-last in 2003 (the first year she applied) to the top seven in 2006 (the year she was promoted). Dkt. No. 67, Exh. B. Therefore, the evidence indicates that in the years following the affirmative action plan, female applicants were able to "catch up" with their male counterparts with respect to promotion rates. Additionally, of the three women promoted between 2003 and 2006, two (Glaser and Walton) were each promoted over two male candidates who scored higher— further evidence that promotion opportunities for women improved even after the affirmative action plan expired.

Plaintiff also relies on statistical evidence that she alleges raises an inference of discrimination. Dkt. No. 80 at 13. She asserts that PMA selected 100% males for promotion in 13 out of 16 promotion months between 1998 and 2006 in Tacoma. *See* Dkt. No. 81, Exh. 16. However, Plaintiff's use of statistics is flawed because it includes periods in which no

women applied to be a foreman—that is, no women entered the foreman selection process that Plaintiff is challenging. It goes without saying that for a period in which no women applied to be foreman, 100% of the promotions would be men. The relevant statistical inquiry for Plaintiff's challenge of the foreman selection process is comparing those who enter the process with those who emerge from it. *See Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002). Here, the statistical evidence shows that, after 2003, promotion rates for female applicants were comparable to or better than rates for males each year. In 2004, the promotion rate was 33% for women and 33% for men. Dkt. No. 88, Exh. 2. In 2005, it was 50% for women and 57% for men, and in 2006, it was 50% for women and 43% for men. *Id.* For the entire four-year period, female applicants had a 75% promotion rate, and male applicants had a 57% promotion rate. *Id.* Moreover, under the prior five-year affirmative action plan (January 8, 1998 to January 8, 2003), female applicants also fared better than males: the promotion rate for women was 67% (two out of three applicants were promoted), which was greater than the men's 23% promotion rate (13 out of 56 applicants were promoted). *See* Dkt. No. 86, Exh. C; Dkt. No. 81, Exh. 3.[2]

Plaintiff also points to the mid-nineties experience of Kristi Hagen, who, despite being qualified, was allegedly refused promotion by PMA unless the union accepted additional foreman slots. Dkt. No. 80 at 13. However, not only is any disparate treatment claim based on something that allegedly happened at least 11 years prior to Plaintiff's lawsuit untimely, *see*

---

[2] It is also worth noting that, after 2003, the percentage composition of women in the applicant pool and in the pool of individuals who were promoted remained consistent. In 2004, women composed 12.5% of the applicant pool and 12.5% of the pool of individuals who were promoted. In 2005, women composed 12.5% of the applicant pool and 11.1% of the pool of promoted individuals, and in 2006, women composed 12.5% of the applicant pool and 14.3% of the pool of promoted individuals. For the entire four-year period from 2003 to 2006, female applicants made up 7.5% of the applicant pool and 9.7% of the individuals who were promoted. (For the five-year affirmative action plan, female applicants composed 5.1% of the applicant pool and 13.3% of the individuals who were promoted.) *See* Dkt. No. 67, Exh. B; Dkt. No. 86, Exh. C; Dkt. No. 81, Exh. 3.

ORDER
PAGE - 15

1   *Antonius v. King County*, 153 Wn.2d 256, 103 P.3d 729, 732 (Wash. 2004) (discrimination

2   claims must be supported by evidence occurring within the three-year period preceding the

3   lawsuit), the experience of Hagen is far removed from the foreman selection process that

4   occurred between 2003 and 2006, which Plaintiff is challenging in her lawsuit. Indeed,

5   Hagen's experience appears to have occurred prior to the adoption and subsequent revisions of

6   the written criteria and procedures utilized for selection of candidates to be promoted to

7   registered foreman—the foremen selection process that Plaintiff contends in this case

8   discriminated against her.

9        In view of the foregoing, Plaintiff has failed to establish the fourth element of her prima

10   facie case, specifically, that she was treated less favorably than similarly qualified male

11   longshore workers. The uncontroverted evidence demonstrates that Plaintiff and her female

12   colleagues who applied for promotions from 2003 to 2006 were treated as favorably or more so

13   that their male counterparts during the relevant period. Moreover, even if Plaintiff could

14   establish a prima facie case, her evidence also fails to demonstrate that PMA's articulated

15   reason for who was promoted to registered foreman—that it depended on how the candidates

16   scored according to the foreman selection criteria—is a pretext for sex discrimination.

17   Accordingly, Plaintiff's disparate treatment discrimination claim will be dismissed.

18           2.   <u>Disparate Impact</u>

19        A prima facie case for disparate impact discrimination is demonstrated by showing

20   (1) a significant disparate impact on a protected class (2) caused by a specific, identified,

21   neutral employment practice or selection criterion. *Stout v. Potter*, 276 F.3d 1118, 1121 (9th

22   Cir. 2002) (*citing Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656-57 (1989)). To

23   establish a prima facie case of disparate impact, the plaintiff does not need to show

24   discriminatory intent. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 349 (1977).

25   However, the plaintiff must prove the discriminatory impact at issue, rather than merely

26   raising an inference of discriminatory impact. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417,

1421 (9th Cir. 1990). Statistics may be used to demonstrate a disparate impact, but "their usefulness depends on all surrounding facts and circumstances." *Int'l Bhd. of Teamsters*, 431 U.S. at 340. Although statistical data alone, in a proper case, may be adequate to prove causation, the "statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Stout*, 276 F.3d at 1122 (*quoting Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 995 (1988)).

Here, Plaintiff asserts that the foreman selection scoring system and the Class A registration "five year rule" have a disparate impact on women. Dkt. No. 80 at 16. With respect to the foreman selection scoring system, the Court has described above, in regards to Plaintiff's disparate treatment claim, how it does not have a disparate impact on women. Indeed, during the relevant period, women applicants for promotion have generally performed comparable to or better than male applicants. *See Stout*, 276 F.3d at 1125 (in upholding summary judgment on disparate impact claim, observing that selection rates for female applicants were comparable to that of males).

Moreover, the statistical evidence offered by Defendants demonstrates that the scoring of female applicants for all of the 11 different factors set forth in Foreman Selection Process guidelines was comparable to that of males. Dkt. No. 68, ¶ 3, Exh. G. In fact, in only one instance did the mean women's score fall outside two standard deviations of the mean men's score, and in that instance the women scored higher than men. *Id.* Plaintiff has provided no statistical evidence rebutting this evidence. *See Stout*, 276 F.3d at 1125 (in upholding summary judgment on disparate impact claim, noting plaintiffs failed to show that women were measured lower than men on the neutral criteria involved in the screening process).

With regard to the Class A registration "five year rule," Plaintiff contends that the "five year rule" (*i.e.*, the requirement that a worker must be Class A registered longshore worker for at least five years before becoming eligible for promotion) has a disparate impact on women because the number of women eligible for promotion was smaller than the overall number of

women who were Class A registered. Dkt. No. 80 at 16. However, to succeed under a
disparate impact theory, Plaintiff would need to make a showing that any disparity between the
two relevant groups of women (those Class A registered and those eligible for promotion
because of five years' service as Class A registered) is significantly different than the same two
groups of men. In other words, Plaintiff would need to demonstrate that the "five year rule"
had a statistically significant negative effect on the number of women who became eligible for
promotion after being subjected to the "five year rule" as compared to the number of men who
became eligible for promotion after being subjected to the "five year rule." *See Paige v.
California*, 291 F.3d 1141, 1145 (9th Cir. 2002) (court must compare the groups that enter the
challenged employment practice with the groups that emerge from the practice). Plaintiff has
failed to meet this burden. The fact that the pool of women eligible for promotion (*i.e.*, that
have five years' service as Class A registered) is smaller than the overall number of women
who were Class A registered, without more, is not probative of disparate impact.[3] Plaintiff has
failed to show that the "five year rule" disparately impacted females' opportunities for
promotion as compared to men. In view of the foregoing, Plaintiff's disparate impact
discrimination claim will be dismissed.

---

[3]    Plaintiff also appears to challenge the "five year rule" on the grounds that women as
a percentage of all Class A registered longshore workers is greater than the percentage of
women ultimately selected for promotion. *See* Dkt. No. 81, Exh. 13. However, not only is this
comparison (and Plaintiff's statistical evidence in support thereof) unhelpful to her disparate
impact claim, Plaintiff is improperly seeking to challenge an overall decision-making process,
instead of a particular element or practice within that process. *See Stout*, 276 F.3d at 1124
(holding plaintiffs generally cannot attack an overall decision-making process in the disparate
impact context, but must instead identify each particular element or practice within that process
that causes an adverse impact). This is particularly true here given that not every woman who
becomes eligible for promotion chooses to apply to be promoted; consequently, the foreman
selection process (which only evaluates the pool of women who apply for promotion) and the
"five year rule" must be evaluated separately.

### 3.   Pattern and Practice

Plaintiff also alleges that she was denied promotion because of Defendants' pattern and practice of sex discrimination. A pattern and practice claim is a variant of the disparate treatment theory because the plaintiff must establish discriminatory intent. *See Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005). However, unlike the traditional disparate treatment claim, the plaintiff alleging a pattern or practice of discrimination must meet her burden by establishing that sex discrimination is the employer's "standard operating procedure -- the regular rather than the unusual practice." *Id.* (*citing Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). By "demonstrating the existence of a discriminatory pattern or practice," the plaintiff will "establish a presumption that [she] had been discriminated against on account of [her sex]." *Id.* (*citing Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875 (1984)). The plaintiff normally establishes that discrimination is the employer's standard operating procedure "through a combination of statistics and anecdotes." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (*citing Int'l Brotherhood of Teamsters*, 431 U.S. at 335-36). Accordingly, a pattern and practice claim is something of a hybrid between a disparate treatment claim and a disparate impact claim. These legal standards also apply to pattern and practice discrimination claims filed under the Washington Law Against Discrimination, RCW 49.60, *et seq. See Oda v. State*, 111 Wn.App. 79, 94 (2002).

Here, Plaintiff relies on the same arguments supporting her disparate treatment and disparate impact claims to support her pattern and practice claim. However, for the same reasons discussed above with respect to Plaintiff's disparate impact and disparate treatment claims, Plaintiff has failed to establish a prima facie case of a pattern and practice of discrimination against women in promotions.[4]

---

[4]   Plaintiff also points out that PMA only promoted two women during the five-year affirmative action plan instead of the requisite three women, and asserts that this is evidence of

1     C.    Retaliation Claim[5]

2     Plaintiff alleges PMA retaliated against her by denying her promotion to registered

3 foreman because of her participation in the earlier *Thompson* and *Scott* actions. Dkt. No. 9,

4 Exh. F, ¶ 3.8. To establish a prima facie case for retaliation, a plaintiff must show that (1) she

5 engaged in statutorily protected activity, (2) that she was subjected to an adverse employment

6 action, and (3) that retaliation for engaging in the protected activity was a substantial factor

7 behind the adverse action. *See Vasquez v. State*, 94 Wn. App. 976, 974 P.2d 348, 352-53

8 (Wash. App. 1999).

9     Here, the settlement of the *Thompson* and *Scott* actions occurred over five years prior to

10 Plaintiff's first denial of promotion to registered foreman in mid-2003. Consequently, as a

11 matter of law, Plaintiff's denial of promotion to foreman is too attenuated in time to establish a

12 causal connection with her participation in the earlier lawsuits. *See Huskey v. City of San Jose*,

13 204 F.3d 893, 899 (9th Cir. 2000) (holding that alleged protected activity occurring seven

14 months prior to adverse action was too attenuated in time to establish causal nexus and to

15 conclude otherwise would be to engage in the logical fallacy of *post hoc, ergo propter hoc*

16 ("after this, therefore because of this")); *see also Richardson v. New York State Dep't of*

17 *Correctional Serv.*, 180 F.3d 426, 447 (2nd Cir. 1999) (holding two-year gap between filing of

18

19 a pattern and practice of discrimination. Dkt. No. 80 at 15. However, PMA's failure to
promote three women during the affirmative action plan occurred outside this lawsuit's three-

20 year statute of limitations period, and therefore cannot support Plaintiff's pattern and practice
claim. *See Antonius v. King County*, 153 Wn.2d 256, 103 P.3d 729, 732 (Wash. 2004). In any

21 case, PMA's failure to promote three women, on its own, is not evidence of a pattern or
practice of discrimination, particularly in view of the fact that, during the affirmative action

22 plan, PMA promoted two of the three female applicants (or 67%) who applied for promotion.
In contrast, PMA only promoted 13 out of 56 male applicants (or 23%) who applied for

23 promotion. (In addition, the third applicant who was not promoted to registered foreman, Gail

24 Ross, accepted a promotion to clerk registration that was effective June 20, 2001. Dkt. No. 65,
¶ 10.)

25      [5]   In her complaint, immediately before her retaliation claim, Plaintiff appears to assert

26 a separate hostile work environment claim. However, her counsel at oral argument confirmed
that Plaintiff does not have a separate claim for hostile work environment.

lawsuit and discharge was "too wide to support the inference that she was terminated in retaliation for complaining about discrimination").

In addition, Plaintiff's claim of retaliation for participating in the earlier lawsuits is significantly undermined by the fact that every named plaintiff in the earlier lawsuits who applied for a promotion to registered foreman received a promotion. The named plaintiffs in the *Thompson* action other than Plaintiff were Nancy Glaser, Linda Nyland, and Kay Thompson, and the *Scott* action was brought by Ronalyn Scott and Gail Ross. In 1997, Scott was promoted to registered foreman, Dkt. No. 65, ¶ 5; in 2001, Ross accepted a promotion to registered clerk, Dkt. No. 65, ¶ 10; and Glaser was promoted to foreman in 2004, Dkt. No. 81, Exh. 3. Plaintiff was promoted in October 2006, after she filed the instant lawsuit, which also undercuts her retaliation claim. *See* Dkt. No. 87, Exh. B. Nyland and Thompson did not apply for promotion to registered foreman. Accordingly, Plaintiff's retaliation claim will be dismissed.

D.     Breach of Contract Claim

Lastly, Plaintiff asserts a breach of contract claim, alleging that Defendants breached the *Scott/Thompson* settlement agreement by failing to promote her to registered foreman from 2002 to 2006. Dkt. No. 9, Exh. F, ¶ 3.11. To establish a prima facie case of breach of contract, a plaintiff must establish (1) the existence of a contract, (2) its breach by the defendant, and (3) resultant injury caused by the defendant's breach. *Munizza v. State Farm Mutual Auto. Ins.*, 1995 U.S. Dist. LEXIS 22361, at *6 (W.D. Wash. June 30, 1995).

The *Scott/Thompson* settlement agreement included the affirmative action plan that stated that at least one out of every five foremen registered in Tacoma (20%) would be female. Dkt. No. 9, Exh. B, ¶ 8(A). On July 17, 2008, Judge Arnold ruled that *Scott/Thompson* settlement agreement's affirmative action plan began on January 8, 1998 and expired on January 8, 2003. Dkt. No. 60. Because 15 individuals were promoted to foreman between January 8, 1998 and January 8, 2003, and only two of the individuals promoted were females

1   (instead of three), Defendants did not comply with the affirmative action plan of the

2   *Scott/Thompson* settlement agreement. *See* Dkt. No. 50. Defendants were required by the

3   affirmative action plan to have promoted one more female to registered foreman during the

4   plan's five-year period. *Id.*

5       Plaintiff did not become eligible for promotion to registered foreman until December

6   2002. Dkt. No. 65, ¶ 16. In 2002, there was no foreman registration process because it was

7   labor contract renegotiation year in which PMA and the union were involved in protracted

8   contract negotiations which ultimately led to a lockout. Dkt. No. 86, ¶ 5. Therefore, because a

9   breach has occurred, the only question is whether Plaintiff would have been the one female

10  promoted registered foreman had PMA complied with the affirmative action plan and held a

11  foreman registration process in 2002.

12      Defendants argue that Plaintiff would not have been promoted because in 2002 she was

13  only eligible for promotion the last two weeks of December: Plaintiff became a Class A

14  registered longshore worker on November 22, 1997, Dkt. No. 65, ¶ 14, and she applied for

15  casual foreman employment on December 13, 2002, and was added to the casual foreman list

16  on December 18, 2002, Dkt. No. 65, ¶ 16. To be sure, of all the promotions that occurred in

17  Tacoma between 1997 and 2006, only one had an effective date in December—Nancy Glaser,

18  whose promotion effective date was December 18, 2004. Dkt. No. 70, Appendix A. Exactly

19  when the foreman registration process that led to Glaser's promotion occurred is not in the

20  record. However, because of the length of time involved in a foreman registration process, and

21  because several male applicants who were scored alongside Glaser in 2004 were promoted in

22  September and November of that year, Dkt. No. 81, Exh. 3, it is reasonable to conclude that the

23  foreman registration process that led to Glaser's promotion occurred prior to December 18,

24  2004. Therefore, it would be logical to conclude from this that had there been a foreman

25  registration process in 2002, it would have transpired prior to Plaintiff's eligibility for

26

promotion, which did not occur until December 18, 2002, but the Court cannot conclude as a matter of law that this would be the case.

However, Plaintiff has not adduced any evidence showing that, even if a foreman registration process had taken place between December 18, 2002 and January 8, 2003, Plaintiff would have been the female applicant selected. The available evidence is to the contrary. Three female applicants applied for promotion in 2003 (when the next foreman registration process occurred): Nancy Glaser, Karen Walton, and Plaintiff. Plaintiff never scored above Glaser or Walton. Dkt. No. 67, Exh. B. Plaintiff has not offered any competent evidence that, despite consistently scoring below Glaser and Walton from 2003 to 2005, she nonetheless would have been selected ahead of them both had a foreman registration process occurred at the end of the year in 2002.[6] From 2003 to 2006, not once was a female applicant selected for promotion over another female candidate who had a higher score. Moreover, during the same period, on only one occasion (out of 28 male promotions) was a male applicant selected for promotion over another male candidate who scored higher than him: in 2005, Thomas Chelius was promoted over another male candidate who had scored higher. Dkt. No. 67, Exh. B. Plaintiff has failed to create a triable issue of fact as to whether she would have been the female applicant selected even if a foreman registration process had taken place in late 2002. Accordingly, Plaintiff's breach of contract claim will be dismissed.

---

[6]   Nancy Glaser was not added to the casual foreman list until February 20, 2003, and therefore would not have been eligible for promotion between December 18, 2002 and January 8, 2003 had there been a foreman registration process at that time. Dkt. No. 67, ¶ 4. However, it is nonetheless appropriate to compare Glaser to Plaintiff here because Glaser was eligible to apply for casual foreman employment as of August 2002. Therefore, it is reasonable to assume that had there been a foreman registration process in late 2002, Glaser would have applied for casual foreman employment (and consequently been added to the casual foreman list) in time to be considered for promotion.

ORDER
PAGE - 23

1        E.      Individual Defendant Weber

2        Individual defendant Joseph Weber has also moved for summary judgment against

3  Plaintiff's claims. Dkt. No. 71. In her response to Defendants' motions for summary

4  judgment, Plaintiff asserts only that Weber is liable to the same extent as PMA. Dkt. No. 80 at

5  2. Accordingly, because Plaintiff's claims against PMA will be dismissed for the reasons

6  discussed above, her claims against individual defendant Weber will also be dismissed.

7                      V.     CONCLUSION

8        For the foregoing reasons, the Court ORDERS that Defendants' Motions for Summary

9  Judgment, Dkt. Nos. 64, 71, are GRANTED and that all claims against Defendants are

10  DISMISSED.

11        DATED this 30th day of December, 2008.

12

13                              JAMES P. DONOHUE
                                 United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26